**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL CASE NO. 1:07cv271**

| | | |
|---|---|---|
| **CATHERINE ANN WEBB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **O R D E R** |
| | ) | |
| **STARBUCKS CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for

Summary Judgment [Doc. 24], filed August 18, 2008, and the Defendant's

Motion to Strike [Doc. 45], filed October 14, 2008.

**PROCEDURAL HISTORY**

On July 30, 2007, the Plaintiff Catherine Ann Webb (Webb) initiated

this action against Starbucks Corporation (Starbucks) alleging causes of

action for retaliation against her for having filed a previous charge of sexual

harassment with the Equal Employment Opportunity Commission (EEOC),

in violation of Title VII of the Civil Rights Act of 1964; intentional infliction of

1

emotional distress; negligent infliction of emotional distress; negligent retention; and wrongful termination. [Doc. 1]. Starbucks filed a timely answer after which the parties conducted discovery. [Doc. 7]. The pending Motion for Summary Judgment was filed pursuant to the Pretrial Order and Case Management Plan, as amended. [Doc. 10, Doc. 14, Doc. 23]. In responding to the motion, the Plaintiff filed an affidavit, portions of which Starbucks moved to strike. [Doc. 45]. Plaintiff has responded to that motion as well [Doc. 47] and the matter is ready for disposition.

## STANDARD OF REVIEW

> Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud,

13 F.3d 791, 798 (4th Cir. 1994), *certiorari denied* 513 U.S. 814, 115 S.Ct.

68, 130 L.Ed.2d 24 (1994), *citing* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  "Regardless of

whether he may ultimately be responsible for proof and persuasion, the

party seeking summary judgment bears an initial burden of demonstrating

the absence of a genuine issue of material fact."  <u>Bouchat</u>, 346 F.3d at

522, *citing* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548,

2553, 91 L.Ed.2d 265 (1986).  If this showing is made, the burden then

shifts to the non-moving party who must convince the Court that a triable

issue does exist.  <u>Id.</u>

> A party opposing a properly supported motion for summary judgment
>
> "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial."  Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

<u>Id</u>.  Nonetheless, in considering the facts for the purposes of a summary

judgment motion, the Court will view the pleadings and material presented

in the light most favorable to the nonmoving party.  <u>Matsushita Electric</u>

Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Despite the fact that the evidence is viewed in the light most favorable to the nonmoving party, in ruling on a motion for summary judgment, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); McCray v. Pee Dee Regional Transp. Authority, 263 Fed.Appx. 301, 302 (4th Cir. 2008), certiorari denied 128 S.Ct. 2963, 76 USLW 3529 (2008) (summary judgment is inappropriate if resolution of an issue of fact depends on a credibility determination).

## FACTUAL BACKGROUND

Since this matter is before the Court on summary judgment, the facts stated are undisputed or presented in the light most favorable to the Plaintiff as the non-moving party. Where there is a sharp disagreement in the forecasts of evidence presented, both versions are stated.

Webb worked as a retail store manager for Starbucks at its Charlotte Street location in Asheville, North Carolina from March 2005 through the end of December 2006. [Doc. 25-4 at 8-9]. At the time she began work,

the store manager was Michael Beatty and the district manager was John

Cheek. [Id.].  After completing an undisclosed period of time in retail store

management training, Webb functioned as the store manager.  In that

position, Webb supervised between twenty and twenty-five employees. [Id.,

at 12].

Webb testified at her deposition that in late December 2005 or early

January 2006, Webb along with Beatty, Beatty's wife and Cheek made

plans to see a play starring Cheek's brother. [Id., at 15].  After going to

dinner and attending the play, the group went back to Cheek's home where

they had drinks. [Id.].  Webb admitted that she had too much to drink and

Cheek offered to let her sleep over. [Id.].  Webb testified that after she

went to bed, Cheek came into the bedroom and "kind of got sideways on

top" of her, pressing his private parts against her.  [Id., 16, 18, Doc. 25-5 at

6].  When Webb asked Cheek what he was doing, he responded "Nothing"

and left the room without any further contact or conversation.  [Id., at 16-

17].  Webb testified that she cried for a couple of minutes and then went to

sleep.  [Id., at 21-2].  The two did not have sexual intercourse. [Id., at 24].

Cheek's deposition testimony regarding this incident is markedly

different.  On the evening in question, Webb was sleeping in Cheek's guest

room because she had become too inebriated to drive home and Cheek

went to sleep in his own bedroom. [Doc. 25-7 at 7]. Cheek heard his bedroom door open and thought that it was his brother coming into his room. [Id.]. He testified that "the next thing I know someone was laying on my bed with me." [Id.]. He realized it was Webb and he told her to go back to the guest bedroom. [Id.]. When Cheek told Webb she should not be in his room, she said that she just wanted to talk and to thank him for taking care of her by letting her sleep over rather than driving home. [Id., at 8]. Cheek told her he had not done anything and again asked her to leave the room. [Id.]. Cheek testified that "at that point, she started to fondle [him]. She was–she put her hand in my underwear and looked at me and said, 'Come on, you know what I'm here for.'" [Id.]. Cheek told Webb that she really needed to leave, but Webb then made a direct demand for sexual intercourse. [Id.]. Cheek testified that at that point he got up and left the room and slept on the couch in the living room. [Id.]. Webb did not follow Cheek into the living room. [Id.].

Webb testified that she did not report this incident to anyone in management at Starbucks. [Doc. 25-4 at 24-25, Doc. 25-5 at 2]. At an undisclosed point in time, Webb complained to Eric White, Cheek's supervisor, that she and Cheek had a personal issue which was impacting work. [Id.]. During that conversation, Webb did not accuse Cheek of

sexual harassment and she did not mention the evening in question. [Id.].

Webb also testified that no other incident occurred which could be

characterized as a sexual advance toward her by Cheek either before or

after the incident. [Id., at 3]. Webb told Cheek shortly thereafter that she

just wanted to forget the incident ever happened and go forward in a

business-like manner. [Id., at 5]. According to Webb, Cheek's attitude

toward her had changed almost immediately after the incident. [Id.]. Prior

to the incident, Cheek was openly complimentary of Webb. [Id.].

Afterward, he would come to the store and tell her that her performance

was terrible without citing specific examples of defective performance. [Id.].

Webb testified that Cheek would come in and spend twenty minutes

looking for something wrong. [Id., at 14].

In February 2006, prior to the time that Webb made any report about

the incident, Cheek assessed a written discipline to Webb for her failure to

post work schedules in a proper manner. [Doc. 25-6 at 8]. On May 13,

2006, also prior to the time that Webb made any report about the incident,

Cheek came into the store to do a district manager's monthly visit. [Id., at

16]. There were a number of items which Cheek found did not comply with

Starbucks' standards. [Id., at 26].

Sometime prior to June 2006, Webb telephoned White and

complained about the manner in which Cheek treated her which caused her to be unable to work with Cheek. [Doc. 25-3 at 7-8].  She did not mention any type of sexual harassment. [Id.].  White suggested that the three of them meet to discuss the situation. [Id.].  Webb told White that she felt Cheek was being too hard on her. [Id., at 10].  Webb at no time raised any personal issues, such as the incident in question. [Id.].  White testified during his deposition that he "left the meeting thinking to [himself] that [Webb] was a manager who [was] being held accountable to standards and was not happy with it." [Id., at 9].  After the June 2006 meeting, White received other complaints from Cheek about Webb, specifically about the cleanliness of her store. [Id., at 11].  Later that summer, White made a surprise visit to Webb's store and found there were still cleanliness and performance issues. [Id., at 12-13].  He noted in particular the presence of fruit flies and that the store was disorganized. [Id.].

Cheek testified about certain performance issues with Webb.  She repeatedly failed to post work schedules for two and three weeks in advance, as is required by Starbucks. [Doc. 25-7 at 12, 14].  There were other occasions when the schedules were not posted at all. [Id., at 14].  Other times, the schedule had been posted but was incorrect because the computer had generated a new schedule. [Id.].  Webb also had a high

turnover of staff in her store. [Id., at 15]. This led to under-staffing of the store. [Id.]. Webb had a persistent problem with a "huge, huge infestation of fruit flies in the store." [Id., at 15-16]. This problem was witnessed by management superior to Cheek. [Id., at 16]. Although the fruit fly problem had existed at that location prior to Webb's watch, it had been rectified and returned under her management. [Id., at 17]. In fact, the new infestation was in a different location. [Id.]. Although they cleaned the entire store, it did not resolve the fruit fly problem because Webb did not do the required tasks. [Id., at 18]. There was also a problem with general lack of cleanliness within the store. [Id., at 16]. Webb persistently failed to keep her cash communications log in accordance with Starbucks standards. [Id.]. Those standards required that the cash till taken in by each employee had to be recorded while being witnessed and the deposits had to be made to the bank and witnessed. [Id.]. In addition, Webb did not complete employee reviews in a timely manner. [Id.].

During the time that Webb was the manager at the Charlotte Street store, there were about five or six complaints made by customers to the Starbucks hotline. [Doc. 25-5 at 9]. In July 2005, a customer emailed the hotline to complain about slow service. [Doc. 25-6 at 4]. In November 2005, one customer complained that the tables in the store were dirty and

the service was slow. [Id., at 6]. In February 2006, a written corrective action was noted because Webb did not have the work schedule properly posted. [Id., at 8]. The May 2006 monthly status report showed significant omissions on the part of the store manager. [Id., at 9]. In July 2006, Webb received another corrective action because the work schedules continued to be posted improperly. [Id., at 10]. On September 25, 2006, Cheek wrote another corrective action report and attached to it his handwritten notes containing the following criticisms: Webb had persistent problems posting work schedules; she did not know how to do till audits; employees' performance reviews were late or non-existent; fruit flies were prominent in the store; the kitchen area was dirty, especially the pastry case; there was confusion among staff as to pay levels; out of date products were on the retail shelves; back to school items which were to be donated to local schools had never been sent; equipment was malfunctioning; and Webb maintained a disorganized desk area and confusing invoices. [Id., at 16-20]. Webb testified that in October 2006, Cheek placed her on a written plan for improvement. [Doc. 25-8 at 3], but also indicated to her that no store manager placed on such a plan had ever retained her job. [Id.]. Cheek suggested that she consider being an assistant store manager. [Id.].

White provided an affidavit in which he explained the Starbucks method of disciplining employees.  If Starbucks guidelines and procedures are not being followed, the employee is first given verbal coaching and if that is not successful, written discipline follows. [Doc. 25-2 at 2].  When an employee does not respond to the written discipline, the employee is placed on a Performance Improvement Plan or PIP which requires the employee to meet specific performance goals within ninety days in order to remain employed. [Id.].  The goals are reviewed at thirty, sixty and ninety day increments. [Id.].  White testified that "Cheek was often reluctant to begin disciplining poorly performing employees, including Cassie Webb." [Id.].  White did feel, however, that the disciplines ultimately received by Webb were legitimate. [Id.].

On September 14, 2006, Webb made a telephone call to the Standards of Business Conduct Helpline for Starbucks. [Doc. 35 at 2].  Pier Mitchell, Compliance Specialist, referred the matter to Jennifer McClain, Partner Resources Manager, for investigation. [Id.].  Webb reported that she and Cheek, her district manager, had been friends in the past, frequently spending time together.  [Id.].  Nine months prior to the call, Webb had ended the personal relationship because she felt it was inappropriate to be friends with her supervisor. [Id.].  During this phone call

there was no mention of sexual harassment or the December 2005 incident. [Id.]. Webb also reported that although Cheek did not seem to be upset by this decision to end the friendship, he almost immediately began to find fault with Webb's performance at work. [Id.]. Three months prior to the phone call, Webb was told by Cheek that she could either resign or he would place her on a ninety day plan "to get rid of her." [Id.]. As a result, Webb reported that she contacted the regional director, Eric White, and the three of them had a meeting in early June 2006. [Id.]. Webb asked to be transferred; however, White refused that request. [Id.]. Instead, White stated that during the next ninety days, Cheek was going to work with Webb on her performance issues. [Id.]. Webb further reported to the helpline that on August 23, 2006, Cheek had a meeting with her during which he advised that the ninety day period was almost over but she had not improved. [Id.]. Webb reported that on August 31, 2006, Cheek had a two hour meeting with the employees of Webb's store in her absence. [Id.]. After that meeting, Cheek advised Webb that her store was still dirty, her performance was poor, and he foresaw that she would be terminated. [Id.]. Very soon thereafter Webb telephoned White to ask again for a transfer. [Id.]. The transfer was denied and White advised Webb that she had several performance issues which she needed to work out with Cheek.

[Id.].  Webb reported to the helpline that on September 11, 2006, Cheek met with Webb and asked how their work relationship could improve.  [Id.].  Webb responded that he should stop being so negative.  [Id.].  Cheek responded that she should just resign.  [Id.].  On September 13, 2006, Webb was disciplined for having too many employees scheduled for work.  [Id.].  The next day, Webb made the helpline call during which she reiterated that she wanted to be transferred to a different store.  [Id.].

Cheek testified that only after he terminated Webb in January 2007, did he learn that Webb had called the Starbucks employee helpline in September 2006 just prior to her annual evaluation. [Id., at 24].

Webb received her annual performance review on October 1, 2006. [Doc. 25-6 at 11].  It was noted that Webb had difficulty setting direction for the store and did not form long-term objectives. [Id., at 11].  There was also a lack of training for the employees as well as an inability to get promotional materials displayed in the store in a timely manner. [Id.].  At the same time, she received good scores for relying on the strengths of her employees, maintaining good customer relations and consistently achieving high sales.  [Id., at 11-13].

Cheek designed a Performance Improvement Plan for Webb on October 2, 2006. [Doc. 25-8 at 5].  That plan specifically noted the areas in

which Webb needed improvement, set forth tasks which she should accomplish on in order to meet expectations, and provided for thirty, sixty and ninety day reviews. [Id., at 6-21]. During the ninety day period of the PIP, Webb received additional written reprimands for being late, for logging employees' time improperly in order to falsely decrease labor costs, failing to conduct safe audits and not following cash handling procedures. [Id., at 11, 13-14]. On December 25, 2006, Webb left her cash till open when she left for the day and she witnessed a bank deposit before it was actually counted and taken to the bank. [Id., at 16-17]. Webb was separated from employment on December 29, 2006. [Id., at 22].

In the midst of these events, very shortly after her annual review and after having been placed on the PIP, Webb filed her first charge of discrimination with the EEOC on October 11, 2006. In this first charge, Webb claimed for the first time that she had been sexually harassed. In that charge, Webb claimed that after rejecting the sexual advance of her supervisor, John Cheek, she had been discriminated against based on her gender and in retaliation for opposing his sexual advance. [Doc. 1-2 at Exhibit A]. This lawsuit, however, is not based on this EEOC charge and Webb does not dispute that she did not timely bring an action based on this charge.

Shortly after her dismissal from employment, Webb filed her second charge of discrimination with the EEOC alleging that she had been discharged in retaliation for filing her earlier charge of discrimination. [Doc. 1-2 at Exhibit B ("I believe that I was discharged in retaliation for opposing sexual harassment and because I had filed a previous charge of discrimination against Respondent[.]")]. In that charge, Webb claimed that Cheek "told me that I was discharged because I had filed a previous charge of discrimination against the company and it was costing them money, so why not just lay my keys down and walk away." [Id.].

Webb has supplied portions of deposition transcripts from employees who worked for her during the time in question. [Docs. 37, 38, 39, 40]. These employees testified that Webb did a good job as the store manager and that Cheek was unfairly hard on her, especially during the fall of 2006.

In opposition to the motion for summary judgment, Webb filed an affidavit in which she expanded on certain allegations made during her deposition. Some of the averments in the affidavit conflict with her deposition testimony. As explained below, the Court has excluded such contradictory evidence from consideration. "[A] party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts." Spriggs v. Diamond Auto

Glass, 242 F.3d 179, 186 n.7 (4th Cir. 2001), *citing* Rohrbough v. Wyeth

Laboratories, Inc., 916 F.2d 970 (4th Cir. 1990); Hernandez v. Trawler Miss

Vertie Mae, 187 F.3d 432, 438 (4th Cir. 1999).

## DISCUSSION

**The retaliation claim.**

"In order to establish a *prima facie* case of retaliation, a plaintiff must

prove three elements: (1) that she engaged in a protected activity; (2) that

her employer took an adverse employment action against her; and (3) that

there was a causal link between the two events." EEOC v. Navy Fed.

Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005), *cert. denied* 547 U.S.

1041, 126 S.Ct. 1629, 164 L.Ed.2d 335 (2006). The filing of an EEOC

charge is well recognized as a protected activity. Brockman v. Snow, 217

Fed.Appx. 201 **3 (4th Cir. 2007), *citing* Laughlin v. Metro. Washington

Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). Although not clear, it

appears that Webb also claims that her call to the employee helpline was a

protected activity.[1]   To the extent that the call constituted any sort of

---

[1]Starbucks argues that the call to the Helpline is outside the scope of the second EEOC charge. In the second charge, however, Webb claimed the Defendant retaliated against her for filing her initial EEOC charge. In the first charge, she alleged the Defendant retaliated against her by placing her on the PIP after she made the call to the Helpline. Though neither pleaded nor presented with clarity, it does appear that the Plaintiff has indirectly raised the call to the Helpline as a protected activity which she claims ultimately to have given rise to the retaliation against her.

participation in investigative activity on the part of Starbucks into the management activities of Cheek, or was a means of the Plaintiff's opposing any alleged discriminatory activity by Cheek, the call would constitute protected activity. Laughlin, 149 F.3d at 259; Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981). As to the second element of the *prima facie* case, discharge from employment is an adverse employment action. Lettieri v. Equant, Inc., 478 F.3d 640 (4th Cir. 2007).

Though Plaintiff has presented a forecast of evidence as to the first two elements, this case presents a close question as to the third element of the *prima facie* case for a retaliation claim. The Defendant argues that since the uncontroverted record reflects that Cheek had identified performance issues with Webb prior to her call to the Helpline and prior to the filing of the initial EEOC charge, that Plaintiff's forecast of evidence as to causal relationship must fail as a matter of law. Defendant relies on Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299 (4th Cir. 2006) for this proposition, arguing that "Where . . . gradual adverse job actions [i.e. criticisms of employee's performance] began well before the plaintiff had ever engaged in any protected activity, any inference of retaliation does not arise." Id. at 309. See also Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 651 (4th Cir. 2002) (If the alleged retaliatory action precedes the

alleged protected act, the element of causation is not met.)  This rule,

however, applies only where the timing of the protected activity and the

alleged retaliatory actions are the *only* evidence presented of causation.

Francis, 452 F.3d at 309.  In order for the Plaintiff to survive summary

judgment she must, therefore, produce a forecast of evidence of causation

by some means other than the mere sequence of the alleged protected

and retaliatory events.  Plaintiff, however, presents direct evidence that her

dismissal was causally connected to her filing of the first EEOC Charge.

She recounts that on the day of her termination from employment that the

following occurred:

> [Cheek] repeated that I needed to quit; he told me to hand him the
> store keys and walk away.  He asked me that if 'this' ever went to
> Court, had I ever 'sat in front of a jury?  It isn't pleasant, you
> couldn't do it.  These charges you have brought are wrong and
> costing [sic] the company money.' . . . John Cheek told me: 'I
> don't care what the attorneys, Eric [White] or the EEOC say, I
> need you to hand me your keys and walk away and save us this
> embarrassment.' I asked him if he was firing me.  John Cheek
> said, 'No, I need you to hand me your keys and walk away.'  I told
> him: 'If you are not firing me and not helping me, I need you to
> leave, because I am trying to do a good job here and complete
> my PIP.'  At that point, John Cheek said, 'There is no way you'll
> be able to fulfill the PIP.  Hand me your keys, you *are* fired.'

[Doc. 33 at ¶23].

A reasonable jury could conclude from this evidence that the early

criticisms of Plaintiff's performance were pretextual and that the PIP did not

necessarily dictate that Plaintiff's employment would be terminated, thus making the termination to be a separate adverse employment action, and that by these words that Cheek admitted that the filing and pursuit of the first EEOC Charge was a direct cause of the termination.

In addition, Webb has presented evidence of what she has argued was increasingly retaliatory conduct toward her by Cheek in the fall of 2006. "[E]vidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." Lettieri, 478 F.3d at 650. Webb's forecast of evidence, taken in the light most favorable to the Plaintiff, shows that Cheek found fault with her entire performance in an effort to set her up for termination and Webb testified that Cheek told her she would never survive the PIP process. The Court held in Littieri that such regularly occurring intervening events, occurring between an employee's complaint and termination, "can reasonably be viewed as exhibiting retaliatory animus on the part of [the supervisors] – are sufficient to show a causal link between Lettieri's complaint and her termination." Id.

For these reasons, the Court must conclude that the Plaintiff has presented a forecast of evidence constituting a *prima facie* case of retaliation.

In addition, to the extent that the Plaintiff is arguing that her

placement of the call to the Helpline was a protected activity, she testifies that this occurred on September 25, while the PIP was not imposed until October 6. This evidence, taken in the light most favorable to the Plaintiff shows that the call set in motion or escalated the series of retaliatory acts that began with the PIP and ended with her termination from employment. This is similar to the circumstances found in EEOC v. Navy Federal, 424 F.3d 397, where the Court held that the plaintiff had made a cognizable claim because the evidence tended to show that Plaintiff's superiors "set in motion a plan to terminate [Plaintiff] in retaliation for her complaints of . . . discrimination, while at the same time seeking to conceal their improper motives under the guise of objective criteria." Id. at 407. The Court, therefore, concludes that the Plaintiff has presented a forecast of evidence sufficient to meet all the elements of a *prima facie* case of retaliation.

Starbucks argues that even if a *prima facie* case is established, it is still entitled to summary judgment. Once an employee establishes a *prima facie* case of retaliation, the burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse action. Smith v. First Union Nat. Bank, 202 F.3d 234, 248 (4th Cir. 2000). If the employer does so, then the burden shifts back to the employee to prove that the employer's purported reason for the action was mere pretext for retaliation.

Id.  Obviously, defective job performance constitutes a legitimate, nondiscriminatory reason for adverse action.  EEOC v. Navy Federal, 424 F.3d at 407 n.10.  Plaintiff, however, has presented evidence of pretext. Her annual performance evaluation contained praise for her management style.  The employees who worked directly for her testified at depositions that she was a good store manager.  It is especially telling that the instances of criticisms dramatically increased in the fall of 2006, as compared with the fall of 2005 when Webb was a much less experienced store manager, even to the point where Webb presents evidence that Cheek told her to just go ahead and resign because no manager had survived the PIP process.  This evidence is very similar to that found in EEOC v. Navy Federal, where there was evidence demonstrating that the employee's supervisors were pleased with her overall job performance and the totality of the evidence concerning job performance was conflicting.  Id. 424 F.3d at 408-09.  For these reasons the Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim will be denied.

**The claims for intentional infliction and negligent infliction of emotional distress.**

The Defendant has moved for summary judgment as to both of the

Plaintiff's emotional distress claims.  Because of the commonality between some of the pertinent elements of these causes of action, they are addressed here together.

> The elements for the tort of intentional infliction of emotional distress are: "(1) extreme and outrageous conduct by the defendant (2) which is intended to cause and does in fact cause (3) severe emotional distress."

Smith-Price v. Charter Behavioral Health Systems, 164 N.C.App. 349, 354-55, 595 S.E.2d 778, 782-83 (2004) (citations omitted).

> To establish a claim for negligent infliction of emotional distress, the plaintiff must prove that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause severe emotional distress ..., and (3) the conduct did in fact cause the plaintiff severe emotional distress."

Id at 354, 595 S.E.2d at 782.

In order to survive summary judgment on either of these claims the Plaintiff must present a forecast of evidence that she has suffered severe emotional distress.  The Defendant argues that Plaintiff has presented no admissible evidence on this point.

The Supreme Court of North Carolina has held that

> [T]he sever emotional distress required for IIED [intentional infliction of emotional distress] is the same as that required for negligent infliction of emotional distress, which is 'any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of *severe and disabling emotional or mental condition which may be generally*

*recognized and diagnosed by professionals trained to do so.'*

Holloway v. Wachovia, 339 N.C. 338, 354-55, 452 S.E.2d 233, 243 (1993), quoting Johnson v. Ruark Obstetrics & Gynecology Assoc., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990) (emphasis added) and citing Waddle v. Sparks, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992).

Defendant has offered in support of its Motion for Summary Judgment the deposition testimony of the Plaintiff where she testified that she was in the same sound mental condition as before her employment at Starbucks, [Doc. 25-4 at 4], thus negating any severe emotional distress. In order to try to overcome this shortcoming in her forecast of evidence, Plaintiff offered an affidavit in opposition to the Motion for Summary Judgment wherein she testified as follows:

> In my deposition, I was asked how I was doing emotionally as a result of what happened to me at Starbucks. I believe I was in denial, and, after noticing some problems I was having in my new employment, I have sought counseling from my EAP.

[Doc. 33 at 7]. Plaintiff goes on to testify in her affidavit that "I have been seeing Diane Sines, L.C.S.W. [Licensed Clinical Social Worker] since July 21, 2008, and I have authorized the release of this statement attached hereto, which I incorporate into this declaration by reference." [Id.]. Attached is an unsworn letter of Diane M. Sines, LCSW, who identifies

herself on her letterhead as "Therapist." [Id. at 8].  Sines opined in the undated letter as follows: (1) she first saw Webb on July 21, 2008; (2) Webb presented with difficulty concentrating, irritability, tension and anxiety; (3) such symptoms, "their duration and their impact on [Webb's] occupational functioning meet the criteria for a generalized anxiety disorder;" and (4) for unidentified reasons, Sines attributes this to Plaintiff's Starbucks experience. [Doc. 33 at 8].  No other evidence is offered regarding the Plaintiff's mental state.

Before addressing this evidence it is necessary to address the Defendant's Motion to Strike both the Sines letter and the paragraph of the Plaintiff's affidavit quoted above. [Doc. 45].  First, with regard to the Sines letter, it is significant that it is a letter and not an affidavit.  Sines' opinions are not sworn in any respect.  The letter is being offered to prove the truth of the matters asserted therein (e.g. that Plaintiff suffers from a generalized anxiety disorder that resulted from her employment with the Defendant), and thus is clearly hearsay.  Fed. Rules Evid. Rule 801.  The Plaintiff does not cite to an hearsay exception that may allow for the admission of this letter.  Moreover, Plaintiff argues that Ms. Sines is not an expert, and that

this letter is offered as the writing of a fact witness.[2] [Doc. 47 at 8-9]. This argument would appear to exclude all possibility of the admissibility of the letter. Fed. Rules of Evid., Rule 802. For this reason the Defendant's Motion to Strike the letter will be granted and the letter cannot be considered as part of the Plaintiff's forecast of evidence.

Defendant's argument to strike the paragraph of Plaintiff's affidavit is based on the contradiction between that paragraph and Plaintiff's deposition testimony. "A party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806-07, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). "The object of [summary judgment] is not to replace conclusory allegations of the complaint [] with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of

---

[2] Ms. Sines was not disclosed as an expert and no expert opinion report was provided in discovery. [Doc. 46 at 12-14].

the plaintiff's testimony is correct." Alba v. Merrill Lynch & Co., 198

Fed.Appx. 288, 300 (4th Cir. 206), *quoting* Barwick v. Celotex Corp., 736

F.2d 946, 960 (4th Cir. 1984). "If a party who has been examined at length

on deposition could raise an issue of fact simply by submitting an affidavit

contradicting his own prior testimony, this would greatly diminish the utility

of summary judgment as a procedure for screening out sham issues of

fact." Id. Plaintiff tries to explain the discrepancy between her deposition

testimony and her current position by asserting that she was "in denial"

during her deposition. [Doc. 33 at 7]. The Plaintiff, however, has offered

nothing to explain why she believes she was in denial. For these reasons

the Defendant's Motion to Strike with regard to that paragraph of Plaintiff's

affidavit will be allowed and that paragraph will not be considered.

Moreover, the paragraph would not have been adequate to provide Plaintiff

with a sufficient forecast of evidence as to this issue of severe emotional

distress. She states that she believes she was "in denial" and that "after

noticing some problems" she sought counseling. That evidence falls far,

far short of a forecast of evidence of "severe and disabling emotional or

mental condition which may be generally recognized and diagnosed by

professionals trained to do so." Johnson, 327 N.C. at 304, 395 S.E.2d at

97.

Since the Court has determined that the Plaintiff has failed to present a forecast of evidence that she suffered any severe emotional distress, it is unnecessary to address the issue of whether Plaintiff's evidence meets the legal requirement as to the outrageousness of the alleged conduct of the Defendant. Suffice it to say that the Plaintiff's evidence is lacking in this regard under the standards imposed by the law. For these reasons the Defendant's Motion for Summary Judgment as to both the intentional infliction and negligent infliction of emotional distress claims will be granted and those claims dismissed.

**The claim for wrongful discharge pursuant to North Carolina law.**

Webb admits in her response to the Motion for Summary Judgment that her claim for wrongful discharge is "primarily" based on retaliatory discharge. [Doc. 42 at 28].

> In Smith v. First Union Nat. Bank, 202 F.3d 234 (4th Cir. 2000), [the Fourth Circuit] held that there was no private cause of action under North Carolina law for sexual harassment under §143-222.2. [The Circuit] stated that ... absent a clear indication from the North Carolina courts or legislature "it would be inappropriate for a federal court to create a private right of action under [§143-422.2]." There is no reason to treat retaliation any differently than [the Circuit] treated sexual harassment[.] ... [T]here is no private right of action under North Carolina for retaliation under §143-422.2.

McLean v. Patten Communities, Inc., 332 F.3d 714, 719 (4th Cir. 2003);

*accord*, Barber v. The Family Center, Inc., 2006 WL 3246608 (W.D.N.C.

2006).

Realizing that the case law presents a death knell to this claim,

Webb changes course in her response to the Motion for Summary

Judgment.  Now, she claims, for the first time, that she was discharged for

refusing to socialize with Cheek, a discharge she claims violated North

Carolina's public policy.  "Cheek terminated Plaintiff for her refusal to

fraternize outside the workplace in an environment of inappropriate and

illegal behaviors: drinking and driving and alcohol induced sexual

encounters."[3] [Doc. 42 at 28].  A plaintiff, however, may not amend her

complaint in the context of a memorandum of law opposing summary

judgment.  Bratcher v. Pharmaceutical Product Development, Inc., 545

F.Supp.2d 533, 547 n.9 (E.D.N.C. 2008); In re aaiPharma Inc. Securities

Litigation, 521 F.Supp.2d 507, 514 (E.D.N.C. 2007), *citing* Car Carriers,

Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984), *certiorari*

*denied* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985) ("[I]t is

---

[3] Moreover, the evidence is undisputed that Webb never accused Cheek of threatening to fire her *unless* she agreed to have sex with him.  McLean, 332 F.3d at 720 (North Carolina law would recognize a cause of action for wrongful discharge where an employee is fired because of her sex for refusing to consent to the sexual advances of the employer).

axiomatic that the complaint may not be amended by the briefs in opposition to a motion [for summary judgment.]").  Summary judgment is also warranted as to this claim.

**The claim for negligent retention.**

The Plaintiff claims that the Defendant was negligent in its retention of Cheek.  In order to state a claim for negligent retention of an employee, a plaintiff must show

> "(1) the specific negligent act on which the action is founded ... (2) incompetency, by inherent unfitness or previous specific acts of negligence from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,' ...; and (4) that the injury complained of resulted from the incompetency proved."

Foster v. Nash-Rocky Mount County Bd. of Educ., 665 S.E.2d 745, 750 (N.C.App. 2008), *citing* Medline v. Bass, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990).

In her Complaint, Webb alleged Starbucks should have known that Cheek engaged in a pattern of retaliatory conduct toward her, failed to supervise him adequately, failed to intercede on her behalf, and negligently retained Cheek as an employee. [Doc. 1].  As discussed above, there is no

private cause of action under North Carolina law for retaliation under N.C.Gen.Stat. §143-422.2. <u>McLean</u>, 332 F.3d at 719. Thus, as the Court in McLean held, any claim for negligent retention based on retaliation must be dismissed. <u>Id</u>.

The only other tortious conduct alleged by Webb relates to the claims for intentional and negligent infliction of severe emotional distress. Since those underlying torts are dismissed, this claim may not go forward. <u>Waddles v. Sparks</u>, 331 N.C. 73, 87, 414 S.E.2d 22, 29 (1992) ("An essential element of a claim for negligent retention of an employee is that the employee committed a tortious act resulting in plaintiffs' injuries."); <u>Hogan</u>, 79 N.C.App. at 496-97, 340 S.E.2d at 124-25 (where evidence does not establish that employee of defendant committed tortious act alleged, plaintiff may not maintain action against defendant employer based on negligent retention). "In other words, North Carolina courts will not hold an employer vicariously liable unless an employee has committed a cognizable [tort] against the plaintiff." <u>Hartsell v. Duplex Products, Inc.</u>, 123 F.3d 766, 774 (4th Cir. 1997). As a result, summary judgment is granted as to the claim for negligent retention.

# ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion to Strike [Doc. 45] is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 24] is hereby **DENIED IN PART** and **GRANTED IN PART** and the Motion for Summary Judgment as to the Plaintiff's claim for retaliation in violation of Title VII of the Civil Rights Act of 1964 is hereby **DENIED** and the Motion for Summary Judgment as to the Plaintiff's claims for intentional infliction of emotional distress; negligent infliction of emotional distress; negligent retention; and wrongful termination is hereby **GRANTED** and these claims are hereby **DISMISSED** with prejudice. Judgment will be rendered separately at the conclusion of the action.

**IT IS FURTHER ORDERED** that this matter is set for trial during the January 20, 2009, civil jury term in the Asheville Division.

Martin Reidinger
United States District Judge

Signed: November 11, 2008